**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SEED HOLDINGS, INC.,

                    Plaintiff,          13 Civ. 2284 (JGK)

        - against -                     OPINION AND ORDER

JIFFY INTERNATIONAL AS, ET AL.,

                    Defendants.

---

JIFFY INTERNATIONAL AS, ET AL.,

                    Plaintiffs,         13 Civ. 2755 (JGK)

        - against -                     OPINION AND ORDER

SEED HOLDINGS, INC., ET AL.,

                    Defendants.

---

**JOHN G. KOELTL, District Judge:**

        The three pending motions in these cases arise out of a
purchase price adjustment provision in an agreement between
Jiffy International AS ("Jiffy"), Jiffy Canada Inc., Southern
Resource Corp., and Northern Resource Corp. (collectively, the
"Sellers"), on the one hand, and Seed Holdings, Inc. ("Seed"),
FMC Acquisition Corp., and AEM Acquisition ULC (collectively,
the "Buyers"), on the other, for the sale of certain assets.
The provision calls for disputes relating to the purchase price
adjustment to be submitted for binding resolution by independent
accountants.  When a dispute regarding the purchase price
adjustment arose, the parties submitted it for resolution to the

Michigan-based accounting firm of Plante & Moran, PLLC (the "IAs").  On April 3, 2013, the IAs issued an award in favor of the Buyers in the amount of $4,240,059.

The Sellers subsequently filed a petition in the Supreme Court of the State of New York, New York County, that sought to vacate or modify the award (the "Jiffy Action").  On the same day, Seed filed a petition in this Court to confirm the award (the "Seed Action").  The Buyers then removed the Jiffy Action to this Court.

The present motions include a motion filed by Seed in the Seed Action to confirm the IAs' award and a motion filed by the Sellers in the Jiffy Action to vacate the IAs' award.  Also before the Court is a motion brought by the Sellers to remand the Jiffy Action to state court and to stay or dismiss the Seed Action pending resolution of the Jiffy Action.

I.

There is no dispute with respect to the following facts relevant to these motions.

A.

The Sellers and the Buyers executed an Asset Purchase Agreement ("APA") as of April 19, 2012, according to which the Buyers agreed to purchase various assets from the Sellers for a

combination of cash and equity.   (Declaration of Michael Q. English ("English Decl."), Ex. A.)

Section 2.8 of the APA called for an adjustment to be made to the purchase price based on a series of calculations relating to the working capital of the acquired assets.   The provision provided as follows:

(a)   On a date that is not less than three (3) Business Days before the Closing Date, Sellers shall provide to Buyers (i) their determination of the Estimated Closing Working Capital, calculated in a manner consistent with the calculation of the Target Working Capital, and (ii) schedules of the then current estimated Inventory and Accounts Receivable as of such date.   At Closing, the Cash Purchase Price used to determine the Net Closing Purchase Price paid to Sellers shall be increased or decreased, as applicable, in accordance with this Section 2.8(a). If and to the extent that the Estimated Closing Working Capital is greater than the Target Working Capital and is also greater than $47 million, the Cash Purchase Price shall be increased by the amount by which the Estimated Closing Working Capital is greater than $47 million.   If and to the extent that the Estimated Closing Working Capital is less than the Target Working Capital and is also less than $43 million, the Cash Purchase Price shall be decreased by the amount by which the Estimated Closing Working Capital is less than $43 million.   For the avoidance of doubt, there will be no adjustment made to the Cash Purchase Price if the Estimated Closing Working Capital is between $43 million and $47 million, inclusive.

(b)   Within thirty (30) days after the Closing, the Buyers shall determine the actual working capital of the Targets as of the Closing (the "Actual Closing Working Capital"), and shall deliver to Sellers their calculations thereof, together with a certificate of the Chief Financial Officer of the Buyers, affirming such calculation.   Such amounts shall be determined in

good faith by Buyers.  Sellers shall have an opportunity to review the Buyers' determination of the Actual Closing Working Capital and, within fifteen (15) days after Sellers' receipt of Buyers' determination, *Sellers shall either agree with the calculation or, after negotiation with the Buyers, agree to submit any dispute to the binding determination of a third party accounting firm mutually selected by Buyers and Sellers (the "Independent Accountants").*  The cost of such Independent Accountants shall be paid fifty percent (50%) by Buyers and fifty percent (50%) by Sellers. The Independent Accountants so selected will prepare a written report to both parties and will submit a resolution of such unresolved disputes within fifteen (15) days after being retained.  *The determination of such Independent Accountants of the Actual Closing Working Capital will be conclusive and binding upon all parties to this Agreement and their Affiliates.*

(c)   If and to the extent that the Actual Closing Working Capital is greater than the Target Working Capital and is also greater than $47 million, the Buyers shall pay the amount by which Actual Closing Working Capital is greater than $47 million to the Sellers by wire transfer of immediately available funds within three (3) Business Days of the earlier of the agreement of the Sellers with such calculation and the final determination by the Independent Accountants.  If and to the extent that the Actual Closing Working Capital is less than the Target Working Capital and is also less than $43 million, the Sellers shall pay the amount by which Actual Working Capital is less than $43 million to the Buyers by wire transfer of immediately available funds within three (3) Business Days of the earlier of the agreement of the Sellers with such calculation and the final determination by the Independent Accountants.  If a party has already made a payment pursuant to Section 2.8(a), the amount of such payment shall be deducted from any amount such party would otherwise owe pursuant to this Section 2.8(c) and if a party has made a payment pursuant to Section 2.8(a) and is owed a payment pursuant to this Section 2.8(c) the amount paid pursuant to Section 2.8(a) will be refunded to such party.  For the avoidance of doubt, any payment made by a party

pursuant to Section 2.8(a) will be refunded to that
party if the Actual Closing Working Capital is between
$43 million and $47 million, inclusive and there
otherwise will be no adjustment made to the Cash
Purchase Price pursuant to this Section 2.8(c) if the
Actual Closing Working Capital is between $43 million
and $47 million, inclusive.

(English Decl., Ex. A, § 2.8 (emphasis added).)

The APA assigned the following definitions:

- "Working Capital" means "the working capital of the
  [Sellers] determined at all times in accordance with
  Schedule 2.8."

- "Actual Closing Working Capital" has the "meaning set
  forth in Section 2.8(b) below."

- "Estimated Closing Working Capital" means "the estimated
  closing Working Capital of the Targets as of the Closing
  Date, determined in good faith by the Sellers."

- "Target Working Capital" means "Working Capital of $45
  million, determined in accordance with GAAP."

- "GAAP" means "United States or Canadian generally
  accepted accounting principles, as applicable, as in
  effect from time to time."

The APA also contained representations and warranties made

by the Sellers.  In Section 3.7, the Sellers warranted that the

"Financial Statements . . . have been prepared in accordance

with GAAP, applied on a consistent basis throughout the periods

covered thereby . . . ."  That Section further provided that

"[t]he December 31, 2011 and February 29, 2012 unaudited

Financial Statements do not include any adjustments that might

be necessary to make these unaudited Financial Statements be in

5

accordance with GAAP as a result of the transactions contemplated by this Agreement."  In Section 3.13, the Sellers warranted that to their knowledge, "none of [the inventory of the Sellers] is slow-moving, obsolete, damaged, or defective, subject only to the reserve for inventory write-down set forth in the Financial Statements as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the [Sellers]."  Finally, in Section 3.15, the Sellers warranted that

> [a]ll Accounts Receivable of the [Sellers] to be included
> in the Acquired Assets are reflected properly on their
> books and records, are valid receivables subject to no
> setoffs or counterclaims, are current and collectible, and
> will be collected in accordance with their terms at their
> recorded amounts, subject only to the reserve for bad debts
> set forth in the Financial Statements as adjusted for
> operations and transactions through the Closing Date in
> accordance with the past custom and practices of the
> [Sellers].

Damages on claims for breaches of representations and warranties of the Sellers were capped at $1 million, minus a $100,000 deductible.[1]  (English Decl., Ex. A, § 8.2(d).)

---

[1] Sections 3.7 and 3.13 were amended on May 17, 2012, but all of the pertinent passages remained unchanged.  (See Jiffy's Verified Am. Pet., Ex. 3 at 3, 4.)

B.

The transaction set forth in the APA closed on May 18, 2012. (Declaration of Arstein Knutson in Supp. of Am. Pet. to Vacate ("Knutson Decl."), ¶ 4.)

On June 15, 2012, the Buyers informed the Sellers that their calculation of actual working capital pursuant to Section 2.8(b) was $33,548,022. (See Jiffy's Verified Am. Pet., Ex. 4 at 1.)  This amount was less than the estimated working capital of $38,367,171 calculated by the Sellers prior to closing pursuant to Section 2.8(a).  Accordingly, the Buyers concluded that the Sellers owed them $4,783,149[2] to remedy the discrepancy. The Buyers explained the discrepancy as arising from the Sellers' failure to account for certain non-salable inventory items (amounting to $3,022,978), an overdue payment to Home Depot (amounting to $1.4 million), and other adjustments that were "minor and customary in nature."  The Buyers represented that they had performed their calculations in accordance with GAAP, and that the Sellers' failure to use GAAP standards accounted for the roughly $3 million of non-salable inventory

---

[2] The actual difference between $38,367,171 (calculated by the Sellers pursuant to Section 2.8(a)) and $33,548,022 (calculated by the Buyers pursuant to Section 2.8(b)) is $4,819,149.  The record does not indicate why the adjustment requested by the Buyers on June 15 was the slightly lower amount of $4,783,149.

that had not been taken into account in the Sellers'
calculations.  (Jiffy's Verified Am. Pet., Ex. 4 at 2.)

On June 21, 2012, the Sellers submitted a letter to the
Buyers with objections to the Buyers' calculation of actual
closing working capital.  In the letter, the Sellers stated a
blanket objection to the Buyers' calculation, as well as several
more specific objections.  (See Jiffy's Verified Am. Pet., Ex.
5.)  The specific objections related to the Sellers' GAAP-based
adjustments.  According to the Sellers, actual closing working
capital was supposed to be calculated "in accordance with GAAP
*as it was consistently applied by Sellers*."  (Jiffy's Verified
Am. Pet., Ex. 5 at 2 (emphasis added).)  The Sellers argued that
by departing from the "Sellers' historic GAAP approach," the
Buyers had improperly shifted the cost to the Sellers of changes
made by the Buyers to the accounting and business practices of
the acquired entities post closing.  (See Jiffy's Verified Am.
Pet., Ex. 5 at 2-4.)

Following this exchange of letters, there ensued a period
of negotiations over the purchase price adjustment.  In
connection with these negotiations, on July 24, 2012, the Buyers
reduced their estimate of the purchase price adjustment owed to
them under Section 2.8 to $4,201,916.  (Jiffy's Verified Am.
Pet., Ex. 19 at 2.)  In September 2012, the Buyers permitted the

Sellers to inspect the inventory of the acquired assets.
(Jiffy's Verified Am. Pet., Ex. 9 at 1.)   In October 2012, the
Sellers then made a counteroffer of $1.7 million.   (See Jiffy's
Verified Am. Pet., Ex. 9 at 1.)   Negotiations ultimately proved
unsuccessful, and the parties entered into an engagement letter
with the IAs around November 2012.   (See Jiffy's Verified Am.
Pet., Ex. 6.)

The engagement letter set forth the procedures to be
followed by the IAs in connection with providing dispute
resolution services "under the terms and provisions of the
[APA]," which included opportunities for written submissions by
the parties; conference calls or meetings between the parties
and the IAs to discuss the parties' positions and answer
questions posed by the IAs; the provision of a draft report to
the parties, with an opportunity for the parties to respond; and
a final report with the IAs' determinations and a brief summary
of the reasons for the determinations.   (Jiffy's Verified Am.
Pet., Ex. 6 at 1-2.)

On December 6, 2012, the parties amended the engagement
letter with an addendum.   (Jiffy's Verified Am. Pet., Ex. 7.)
The addendum expressly stated that it was "not intended to be,
and [wa]s not to be construed as, an amendment to th[e APA] or

any other agreement between the Buyers and Sellers."  (Jiffy's Verified Am. Pet., Ex. 7 at 1.)  It then stated that the IAs

> will require, and Seed Holdings and Jiffy agree to provide, complete, sufficient and appropriate documents and other materials to substantiate all relevant facts asserted in each of the respective parties' submissions.  The extent of the materials that [the IAs] will require will be subject to [their] discretion, and will include but are not be limited to:
>
> 1. Documentation related to post-acquisition aging, collection activity and payments received related to accounts receivable outstanding as of the Acquisition Date.
>
> 2. Documentation related to post-acquisition activity or events in connection with Home Depot servicing cost settlements.
>
> 3. Documentation related to post-acquisition McKenzie inventory dispositions and recoveries.

(Jiffy's Verified Am. Pet., Ex. 7 at 1.)

The parties then provided written submissions to the IAs on December 7, 2012.  In the Sellers' submission, the Sellers asserted that the proper accounting methodology to be used in the calculations to be performed under Section 2.8 was "GAAP as consistently applied by Sellers in accordance with past custom and practice."  (See Jiffy's Verified Am. Pet., Ex. 8 at 1.) The Sellers also requested that the IAs investigate miscellaneous other adjustment inputs asserted by the Buyers, such as the outstanding Home Depot payment.  (Jiffy's Verified Am. Pet., Ex. 8 at 9.)  They did not provide a particular recommended sum for the final adjustment.

10

In the Buyers' submission, the Buyers asserted that the working capital adjustment should be $6,546,253. (Jiffy's Verified Am. Pet., Ex. 9 at 1.)  This amount was greater than the roughly $4.8 million adjustment calculated by the Buyers on June 15 and the roughly $4.2 million offer made on July 24.  The discrepancy was attributed primarily to the result of a detailed November audit performed by the Buyers, during which they went through "all items that were carried [in] inventory in excess of 3-years (the same criteria we use, based on GAAP)." (Jiffy's Verified Am. Pet., Ex. 9 at 1.)

After reviewing the parties' submissions, the IAs conducted a conference call on February 1, 2013. (See Jiffy's Verified Am. Pet., Ex. 11 at 1.)  The purpose of the call was for the IAs to ask any remaining questions of the parties. (Jiffy's Verified Am. Pet., Ex. 11 at 1.)  Attorneys were allowed to be present but were not permitted to participate. (See Jiffy's Verified Am. Pet., Ex. 12 at 1.)

On March 8, 2013, the IAs then issued a draft report in which they concluded that the proper purchase price adjustment was $4,240,059. (Jiffy's Verified Am. Pet., Ex. 13 at 6.)  In a letter dated March 18, 2013, the Sellers submitted objections to the IAs' draft report. (Jiffy's Verified Am. Pet., Ex. 14.)  Reponses and replies were submitted on March 26 and March 28,

11

2013, respectively.  (Jiffy's Verified Am. Pet., Ex. 15, Ex. 16.)  On March 20, 2013, the IAs held a conference call with the parties to discuss the parties' objections to the draft report. (See Jiffy's Verified Am. Pet., Ex. 12 at 1.)


                              C.


     The IAs issued their final report on April 3, 2013.  The total award amount was $4,240,059 in favor of the Buyers. (Jiffy's Verified Am. Pet., Ex. 1 at 6.)

     The final report explained that in the face of ambiguity in the APA as to which accounting methodology to use in calculating the purchase price adjustment, the IAs had opted for United States or Canadian GAAP, effective as of the closing date, giving appropriate recognition to all events and conditions known or knowable at that time.  (See Jiffy's Verified Am. Pet., Ex. 1 at 1-3.)  Moreover, the calculations with respect to working capital were to follow the Sellers' previously established accounting practices and methods to the extent that they complied with GAAP.  (See Jiffy's Verified Am. Pet., Ex 1 at 2-3.)  The IAs further concluded that although "the APA provides for the calculation of Actual Closing Working Capital to be provided within 30 days after the Closing Date and makes no provision for continued adjustments of that Actual Closing

Working Capital calculation as a result of events and developments subsequent to June 19, 2012," a "consequence of the manner in which the parties chose to proceed is that the books on the disputed matters have essentially been kept open by both parties in at least some respects and the positions of both in this proceeding, along with the information submitted in support of those positions, have been put forth in some part based on and reflecting events and information that developed subsequent to [the closing]." (Jiffy's Verified Am. Pet., Ex. 1 at 2-3.) Such events and information were "taken into account" and "informed [the] decision" in rendering the award. (Jiffy's Verified Am. Pet., Ex. 1 at 3.) The final report makes clear that the IAs made adjustments based on both the Buyers' calculation of actual working capital (under Section 2.8(b)) and the Sellers' calculation of estimated working capital (under Section 2.8(a)). (See Jiffy's Verified Am. Pet., Ex. 1 at 2-3.)

D.

On April 8, 2013, the Sellers commenced the Jiffy Action against the Buyers in the New York State Supreme Court, seeking to vacate the IAs' award pursuant to Section 7601 of the New York Civil Procedure Law and Rules. See Notice of Removal, Jiffy Int'l AS v. Seed Holdings, Inc., No. 13 Civ. 2755, Docket

No. 1 (S.D.N.Y. Apr. 25, 2013).  On the same day, Seed commenced the Seed Action in this Court against the Sellers, seeking summary confirmation of the IAs' award pursuant to § 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207.  <u>See</u> Pet. to Confirm Arbitration Award, <u>Seed Holdings, Inc. v. Jiffy Int'l AS</u>, No. 13 Civ. 2284, Docket No. 1 (S.D.N.Y. Apr. 8, 2013).  On April 25, 2013, the Buyers removed the Jiffy Action to this Court.  <u>See</u> Notice of Removal, <u>Jiffy Int'l AS</u>, No. 13 Civ. 2755, Docket No. 1 (S.D.N.Y. Apr. 25, 2013).  A motion to confirm the IAs' award was filed in the Seed Action on April 26, 3013, and a motion to vacate the IAs' award was filed in the Jiffy Action on May 24, 2013.

In an Order dated June 17, 2013, the Court sua sponte raised the question of whether there is a proper basis for subject matter jurisdiction in the Jiffy Action, and thereafter the Court required the parties to brief the issue.  <u>See</u> Order, <u>Jiffy Int'l AS</u>, No. 13 Civ. 2755, Docket No. 27 (S.D.N.Y. June 17, 2013); Order, <u>Jiffy Int'l AS</u>, No. 13 Civ. 2755, Docket No. 31 (S.D.N.Y. July 8, 2013).  On July 27, 2013, the Sellers filed a motion to remand the Jiffy Action and to stay or dismiss the Seed Action.

14

II.

The Sellers argue that this Court lacks subject matter jurisdiction in the Jiffy Action because complete diversity is lacking, and because there is no basis for federal question jurisdiction, and that removal of this action to federal court was improper.  The Buyers contend that there are two valid bases for subject matter jurisdiction—diversity jurisdiction and federal question jurisdiction under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "Convention") as implemented in Chapter 2 of the FAA—and that removal of this action was proper under the specific removal provision in § 205 of the FAA, 9 U.S.C. § 205.

The party asserting federal jurisdiction bears the burden of proving that the case is properly in federal court.  "Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper."  United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994).

The Convention provides federal jurisdiction over "action[s] or proceeding[s] falling under the Convention."  9 U.S.C. § 203.  Section 202 of the FAA in turn states that,

15

subject to an exclusion for entirely domestic disputes, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial . . . falls under the Convention." Id. § 202.  The FAA also contains its own removal provision, which provides for removal of cases from state court where the "subject matter of [the] action or proceeding . . . relates to an arbitration agreement or award falling under the Convention."  Id. § 205.

The Court of Appeals for the Second Circuit has adopted a four-factor test for determining whether an arbitration agreement falls under the Convention: "(1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope." Smith/Enron Cogeneration Ltd. P'Ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999) (collecting cases).  In their briefs, the Sellers do not concede that the APA meets any of these requirements.  However, there cannot be any serious dispute that factors one, three, and four are satisfied,[3] and at argument the Sellers clarified that their

---

[3] Under the Convention, a written agreement "include[s] an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams."  U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping

objection to federal question jurisdiction relates to factor two—whether the written agreement "provide[s] for arbitration in the territory of a signatory of the convention." (See Oral Arg. Tr. at 9-10.) The Sellers argue that federal question jurisdiction is lacking because the APA did not explicitly provide for arbitration in the territory of a signatory country. The Sellers also argue that removal was improper because the price adjustment proceeding before the IAs was not an "arbitration," and the Jiffy action therefore does not "relate to an arbitration agreement" as required for removal under § 205.[4]

---

Co., 241 F.3d 135, 146 (2d Cir. 2001) (alteration in original) (citations omitted). There is no dispute that Section 2.8 of the APA is a valid and enforceable contractual agreement to submit disagreements about the price adjustment to binding resolution by the IAs. Accordingly, Section 2.8 qualifies as a "written agreement" for purposes of the Convention and Chapter 2 of the FAA. Similarly, there can be no reasonable dispute that the subject matter of Section 2.8—which governs adjustments to the calculation of working capital in the sale of corporate assets from one company to another—was commercial. Finally, factor four of the test is satisfied because the price-adjustment provision of the APA involved a dispute between parties located in Canada and the United States. See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997).

[4] The question of whether the proceeding before the IAs was an "arbitration" determines not only whether removal was proper under § 205, but also whether the Court has jurisdiction under § 203.

A.

The Sellers contend that factor two of the Smith/Enron test is not satisfied because the APA does not provide for arbitration in the territory of a signatory country.  While there is indeed no express venue provision in Section 2.8, this argument is without merit because it is plain that the price adjustment proceeding occurred in the United States, a signatory country.

The territory requirement in factor two has its genesis in the language of Article I of the Convention, which provides that "any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State." Convention, art. I(3).  The United States adopted this reciprocity limitation upon accession to the Convention, and it has been cited as the reason for requiring an arbitration agreement to specify that an arbitration occur in the territory of a signatory country before the agreement can be deemed to fall under the Convention, such that the parties should be compelled to arbitrate.  See Ledee v. Ceramiche Ragno, 684 F.2d 184, 186 (1st Cir. 1982); see also Smith/Enron, 198 F.3d at 92 (adopting the four-factor test and citing Ledee as its source).

The reciprocity requirement is clearly satisfied in the context of petitions to vacate or confirm an arbitration award when the award has been made in the territory of a signatory country, regardless of whether the arbitration agreement in question expressly designates a signatory country as the location for the arbitration.  When the award has already been made, it is possible to determine whether the award has been made in the territory of a country that adheres to the Convention.  See Lander Co. v. MMP Investments, Inc., 107 F.3d 476, 482 (7th Cir. 1997) ("[T]he United States will enforce pursuant to the Convention only arbitral awards *made* in nations that also adhere to the Convention.  This is the significance of the reference to reciprocity.  The United States will not enforce an arbitration award *made* in a country that, by failing to adopt the Convention, has not committed itself to enforce arbitration awards made in the United States." (emphasis added)).  The concern underlying the territory requirement in factor two—namely, that the Convention not be applied to compel arbitrations that ultimately do not occur in the territory of a signatory country—is not present when an arbitration has already occurred in the territory of a signatory country.  See Smith/Enron, 198 F.3d at 95 ("If the arbitration results in an award, it will have been granted in a signatory State and will

19

be enforceable either [in the United States] or in another
Contracting State.").  It is therefore of no moment that Section
2.8 of the APA contains no venue provision.  The arbitration
award was made in the United States, and the territory
requirement is therefore satisfied.


                              B.

     The Sellers also contend that removal was improper because
the Jiffy Action does not "relate to an arbitration," as that
phrase is used in § 205 of the FAA, because the determination by
the IAs under Section 2.8 of the APA was a price appraisal
rather than an arbitration.  The Buyers counter that the
proceeding before the IAs was an arbitration.

     While Section 2.8 does not use the term "arbitration," it
requires the parties to submit their dispute with respect to
working capital "to the binding determination of a third party
accounting firm."  Courts have generally concluded that "[n]o
magic words such as 'arbitrate' . . . are needed to obtain the
benefits of the [FAA]."  AMF Inc. v. Brunswick Corp., 621 F.
Supp. 456, 460 (E.D.N.Y. 1985) (Weinstein, J.); see also Bakoss
v. Certain Underwriters at Lloyds of London Issuing Certificate
No. 0510135, 707 F.3d 140, 142-44 (2d Cir. 2013) (finding that a
clause calling for a third-party physician to make a

                              20

determination about the plaintiff's disability constituted an "arbitration agreement"); McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 830 (2d Cir. 1988) ("It is, in our estimation, irrelevant [for purposes of the FAA] that the contract language in question does not employ the word 'arbitration' as such."); Cummings v. Consumer Budget Counseling, Inc., No. 11 Civ. 3989, 2012 WL 4328637, at *3 (E.D.N.Y. Sept. 19, 2012) (finding an agreement to "abide by the decision of the mediator" to constitute an agreement to arbitrate under the FAA, "notwithstanding the nomenclature used by the parties"). "Rather, what is important is that the parties clearly intended to submit some disputes to their chosen instrument for the definitive settlement of certain grievances under the Agreement." McDonnell Douglas, 858 F.2d at 830 (citation and internal quotation marks omitted).

Thus, the crucial inquiry is whether the parties have agreed to submit a dispute that has arisen between them for final and binding determination by a third-party. See id. at 830-31; Cummings, 2012 WL 4328637, at *3. Indeed, in McDonnell Douglas, the Second Circuit Court of Appeals cited with approval cases where the submission of disputes to appraisers and to accountants were found to be arbitrations even though the term "arbitration" was not used. See 858 F.2d at 830-31.

21

Under this standard, Section 2.8 of the APA clearly calls for an "arbitration" as that term is used in the FAA.[5]  By its terms, it is an "agree[ment] to submit any *dispute* to the *binding determination* of a third party accounting firm." (English Decl., Ex. A, § 2.8 (emphasis added).)  And Section 2.8 further states that "[t]he determination of [the] Independent

_____

[5] Some courts employ a more detailed multi-factor test, according to which they "look for the 'common incidents' of 'classic arbitration,' including (i) an independent adjudicator, (ii) who applies substantive legal standards (i.e. the parties' agreement and background contract law), (iii) considers evidence and argument (however formally or informally) from each party, and (iv) renders a decision that purports to resolve the rights and duties of the parties, typically by awarding damages or equitable relief." Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 524 F.3d 1235, 1239 (11th Cir. 2008) (citation omitted).  However, the Second Circuit Court of Appeals recently cited with approval the language from AMF in which Judge Weinstein found that "an adversary proceeding, submission of evidence, witnesses and cross-examination are not essential elements of arbitration" as long as "the parties have agreed to submit a dispute for a decision by a third party . . . ." Bakoss, 707 F.3d at 143 (quoting AMF, 621 F. Supp. at 460).  The Second Circuit standard puts heavy emphasis on the binding nature of the third-party's resolution while deemphasizing the relevance of the procedures used.  In any event, the "common incidents of classic arbitration" were present in this case, and the same result would therefore obtain under the multi-factor test.  (See Jiffy's Verified Am. Pet., Ex. 1 at 3 (enumerating the procedures followed by the IAs, including the adversarial presentation of evidence and arguments, a hearing in the form of a conference call, and the interpretation and application of the terms of the parties' agreement).)  The procedure before the IAs also resulted in a reasoned decision that was more extensive than that provided in many arbitrations.

Accountants . . . will be *conclusive and binding* upon all parties to th[e] Agreement and their Affiliates."  (English Decl., Ex. A, § 2.8 (emphasis added).)  Given that Section 2.8 prescribes a final and binding dispute resolution by the IAs, it is irrelevant that the process is not termed an "arbitration." The IAs' determination constitutes an arbitration for FAA purposes, and the Jiffy Action therefore "relates to an arbitration" under § 205.

C.

Because this Court has federal question jurisdiction over the Jiffy Action under the Convention and because removal was proper,[6] the Sellers' motion to remand the Jiffy Action must be

---

[6] The state-court Complaint in the Jiffy Action stated only a cause of action under New York Law—specifically, Section 7601 of the New York Civil Practice Law and Rules, which authorizes "[a] special proceeding [to] be commenced to specifically enforce an agreement that a question of valuation, appraisal or other issue or controversy be determined by a person named or to be selected."  N.Y. C.P.L.R. § 7601 (McKinney 2013).  However, § 205 permits removal when "the ground for removal . . . [does] not appear on the face of the complaint but [is] shown in the petition for removal."  9 U.S.C. § 205; see also Banco de Santander Central Hispano, S.A. v. Consalvi Int'l Inc., 425 F. Supp. 2d 421, 427 (S.D.N.Y. 2006) ("[Section] 205[ ] . . . creates a statutory exception to the well-pleaded complaint rule . . . ." (citation and internal quotation marks omitted)). The removal petition in the Jiffy Action clearly cites Chapter 2 of the FAA as a ground for removal and for federal question jurisdiction.

denied, and the Sellers' motion to stay or dismiss the Seed Action must be denied as moot.  There is, accordingly, no occasion to address the availability of diversity jurisdiction under 28 U.S.C. § 1332 or the applicability of the general removal provision in 28 U.S.C. § 1441.[7]

### D.

The parties have both moved for costs and attorneys' fees in connection with the Sellers' remand motion.  The Sellers argue that they are entitled to costs and attorneys' fees under 28 U.S.C. § 1447(c), which permits an "order remanding [a] case [that was improperly removed to] require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  Given that removal of the Jiffy Action was proper, no remand order will issue, and the Sellers' motion must be denied.  Id.; see Little Rest Twelve, Inc. v. Visan, 829 F. Supp. 2d 242, 245 (S.D.N.Y. 2011) ("[C]ourts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." (citation omitted)).

---

[7] This Court also has jurisdiction over the Seed Action based on the Convention.  Because the parties are somewhat different in the Seed Action, there is also no dispute that there is diversity-of-citizenship jurisdiction in that action.  See 28 U.S.C. § 1332.

The Buyers argue that they are entitled to costs and attorneys' fees in defending the motion because the Sellers made arguments in connection with the remand motion that were in bad faith.  "[Courts] do[] have the power to award attorneys' fees to a successful litigant when his opponent has commenced or conducted an action in bad faith, vexatiously, wantonly, or for oppressive reasons."  Dow Chem. Pac. Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir. 1986) (citations and internal quotation marks omitted).  However, the Court of Appeals for the Second Circuit has "declined to uphold awards under the bad-faith exception absent . . . clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes."  Id. (citation and internal quotation marks omitted).  There is no evidence that the Sellers' arguments were made for any improper purpose, that the Sellers have disobeyed any Court orders, or that the Sellers have employed oppressive tactics.  See id. at 345.  Indeed, the Sellers brought their motion in response to a Court Order directing them to move to dismiss for lack of jurisdiction.  Accordingly, the Buyers' motion for costs and attorneys' fees must be denied.

25

III.

The Court now turns to the merits of the parties' dispute. Before the Court are the Buyers' motion to confirm the IAs' award in the Seed Action and the Sellers' motion to vacate or modify the IAs' award in the Jiffy Action.

The Sellers raise two main substantive objections to the determination by the IAs.  They allege that the IAs erred by considering various adjustments to working capital that were not raised in the initial thirty-day period after closing for raising such objections.  They also allege that the IAs erred in basing their determination on GAAP rather than on the accounting practices that the Sellers had employed.  While the Sellers have not been clear or consistent with respect to the doctrinal basis for these claims, they appear to raise these objections on the grounds that these issues were not "arbitrable" because the parties had not agreed to submit the issues to the IAs.  If that argument fails, the Sellers contend generally that the determination should be vacated because the IAs "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award . . . was not made."  9 U.S.C. § 10(a)(4).

Where, as here, "an arbitral award falling under the Convention is made," any party to the arbitration may apply to any court with jurisdiction for an order confirming the award.

26

9 U.S.C. § 207.  In such case, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention."  Id.

Article V of the Convention "provides the exclusive grounds for refusing confirmation under the Convention."  Yusuf Ahmed Alghanim & Sons, 126 F.3d at 20 (citing Convention, art. V).  However, one of the exclusive grounds in Article V is where an award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  Convention, art. V(1)(e).  The Court of Appeals for the Second Circuit has interpreted Article V(1)(e) "to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law . . . to a motion to set aside or vacate that arbitral award."  Yusuf Ahmed Alghanim & Sons, 126 F.3d at 21.  Thus, Chapter 1 of the FAA and all of its grounds, express and implied, for modification and vacatur of arbitral awards apply to the objections proffered by the Sellers.[8]  See id. at 23 ("The Convention specifically

---

[8] The Sellers also assert that the award should be vacated or modified under the provisions of New York law governing price appraisals and arbitration awards.  The grounds for modification or vacatur of an arbitration award under the New York Civil Practice Law and Rules are identical for present purposes in language and substance to the grounds asserted under the FAA.

contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." (citing Convention, art. V(1)(e))).

The FAA creates a "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Bank Julius Baer & Co. v. Waxfield, Ltd., 424 F.3d 278, 281 (2d Cir. 2005) (internal citation and quotation marks omitted). The FAA expresses "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983); see also Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 223 (2d Cir. 2001). This federal policy requires courts to "construe arbitration clauses as broadly as possible." S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 194 (2d Cir. 1984).

---

See 9 U.S.C. §§ 10(a)(4) & 11(b); N.Y. C.P.L.R. § 7511(b)(1)(iii) & (c)(2); United States v. Am. Soc'y of Composers, Authors & Publishers, 32 F.3d 727, 732-33 (2d Cir. 1994); MasTec N. Am., Inc. v. MSE Power Sys., Inc., 581 F. Supp. 2d 321, 329-31 (N.D.N.Y. 2008). Accordingly, the Court's resolution of the Sellers' claims under the FAA is also dispositive of their claims under New York law.

Nevertheless, it is also true that "the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties." <u>Mastrobuono v. Shearson Lehman Hutton</u>, 514 U.S. 52, 57 (1995). "Arbitration under the Act is a matter of consent, not coercion . . . ." <u>Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 479 (1989). Thus, "[a]lthough the [Supreme Court] has . . . long recognized and enforced a liberal federal policy favoring arbitration agreements, it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83 (2002) (internal citation and quotation marks omitted). The question remains whether the Sellers' objections to the IAs' determinations are truly questions of arbitrability.

The Supreme Court has noted that although, "[l]inguistically speaking, one might call any potentially dispositive gateway question a 'question of arbitrability,' for its answer will determine whether the underlying controversy will proceed to arbitration on the merits," under the case law, "the phrase 'question of arbitrability' has a far more limited

scope." Id. at 83 (citation omitted).  Thus, the phrase applies only

> in the kind of narrow circumstance where contracting
> parties would likely have expected a court to have decided
> the gateway matter, where they are not likely to have
> thought that they had agreed that an arbitrator would do
> so, and, consequently, where reference of the gateway
> dispute to the court avoids the risk of forcing parties to
> arbitrate a matter that they may well not have agreed to
> arbitrate.

Id. at 83-84.  Such matters include: (1) "whether the parties

have a valid arbitration agreement at all," and (2) "whether a

concededly binding arbitration clause applies to a certain type

of controversy." Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444,

452 (2003) (citation omitted); see also BG Grp., PLC v. Republic

of Argentina, -- S. Ct. --, 2014 WL 838424, at *7 (Mar. 5,

2014).

By contrast, "procedural questions which grow out of the

dispute and bear on its final disposition" are presumed to have

been committed to determination by the arbitrator.  Howsam, 537

U.S. at 84 (citation and internal quotation marks omitted); see,

e.g., BG Grp., 2014 838424, at *8 (collecting cases); UBS Fin.

Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 655 (2d

Cir. 2011); Munich Reins. Am., Inc. v. Nat'l Cas. Co., No. 10

Civ. 5782, 2011 WL 1561067, at *1 (S.D.N.Y. Apr. 26, 2011);

Safra Nat'l Bank of N.Y. v. Penfold Inv. Trading, Ltd., No. 10

Civ. 8255, 2011 WL 1672467, at *3 (S.D.N.Y. Apr. 20, 2011).

The Sellers contend that their objections to the authority of the IAs to make their determinations raise "questions of arbitrability," subject to de novo judicial review.  See Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2068 n.2 (2013). For the Buyers, these objections are challenges to the IAs' determinations on matters that were properly before them, and therefore subject to only "severely limited" review on a discrete set of statutory grounds.  See Willemijn Houdstermaatsschappij, BV v. Standard Microsys. Corp., 103 F.3d 9, 12 (2d Cir. 1997).  Therefore, the initial question is whether the Sellers' objections are complaints that the issues decided by the IAs were not arbitrable.  See First Options of Chi. v. Kaplan, 514 U.S. 938, 942-43 (1995).

## A.

The Sellers proffer two main arguments as to why the IAs exceeded the scope of their authority in rendering the award: first, that the IAs made improper adjustments to working capital based on late-raised claims by the Buyers, and second, that the IAs made improper adjustments to working capital by relying on GAAP.

31

1.

The Sellers argue that the IAs improperly granted working capital adjustments to the Buyers that were sought by the Buyers for the first time outside of the contractual deadline for submitting requests for adjustments.  The Sellers argue that Section 2.8 sets a hard-and-fast deadline of thirty days after closing for the Buyers' submissions regarding working capital adjustments, and that several of the IAs' adjustments were invalid because they were based in part on submissions made by the Buyers after this deadline had passed.  In other words, according to the Sellers, the IAs exceeded the scope of their authority under the APA by granting requests for adjustments to working capital that were untimely.

Disputes about the timeliness of submissions of claims to arbitrators are "procedural" questions that courts have found not to raise questions of substantive arbitrability.  See Howsam, 537 U.S. at 85 ("[W]e find that the applicability of the [arbitration body's] time limit rule is a matter presumptively for the arbitrator, not for the judge."); Conticommodity Servs. Inc. v. Philipp & Lion, 613 F.2d 1222, 1224-25 (2d Cir. 1980) (finding that the alleged untimeliness of a demand for arbitration made outside of a contractual one-year time limit was a matter for the arbitrators, rather than the court, to

decide); Town of Amherst v. Custom Lighting Servs., LLC, No. 07
Civ. 261S, 2007 WL 4264608, at *11 (W.D.N.Y. Nov. 30, 2007)
("[T]he question of whether [a party] failed to give notice of
its claim in the appropriate manner and timeframe, thereby
precluding a determination on the merits, is a matter for the
arbitrator . . . ."); Goldman, Sachs & Co. v. Griffin, No. 07
Civ. 1313, 2007 WL 1467430, at *4 (S.D.N.Y. May 16, 2007)
("Under the FAA and the governing case law, the issue of whether
respondent's claims are barred by any New York statute of
limitation[s] is for the arbitrator, not this Court.").[9]  Such
questions do not implicate "the validity of the arbitration
clause" or its "applicability to the underlying dispute between
the parties," and they are therefore not for courts to decide de
novo.  Green Tree Fin. Corp., 539 U.S. at 452.

The Sellers' first objection is a procedural objection to
the consideration by the IAs of issues that the Sellers claim

---

[9] Although Town of Amherst and Goldman, Sachs & Co. involved
statutory time-bars, and Howsam involved a National Association
of Securities Dealers rule, Conticommodity is squarely on point
in that it involved a time-bar that was built into the
arbitration agreement itself.  See 613 F.2d at 1224.  Moreover,
the Second Circuit Court of Appeals has stressed that "any
limitations defense—whether stemming from the arbitration
agreement, arbitration association rule, or state statute—is an
issue to be addressed by the arbitrators."  Shearson Lehman
Hutton, Inc. v. Wagoner, 944 F.2d 114, 121 (2d Cir. 1991)
(citations omitted).

were not timely raised under the APA, and it therefore raises a
procedural issue for the IAs' determination, not a "question of
arbitrability" for the Court.  The Sellers' complaint is an
argument that the IAs should not have considered allegedly
untimely claims, but that is the kind of procedural issue that
is part of the dispute submitted to the arbitrators.  Thus, this
objection may only be addressed under the severely limited and
deferential review applicable to arbitrators' decisions on
matters that are properly before them.

2.

The Sellers' second objection is that the IAs made
adjustments to working capital under Section 2.8 of the APA that
were improper because the IAs used United States or Canadian
GAAP as an accounting methodology instead of "GAAP in accordance
with the Sellers' past custom and practices."  According to the
Sellers, this was improper for two reasons.  First, according to
the Sellers' reading of Section 2.8, the provision expresses the
clear intent of the parties to have working capital calculated
"in accordance with the Sellers' past custom and practices"
rather than strictly in accordance with GAAP.  The Sellers also
argue that the GAAP adjustments were improper because the APA
contains express representations as to the Sellers' compliance

34

with GAAP in preparing their financial statements, and these representations indicate the parties' intent to remove claims for non-compliance with GAAP from the jurisdiction of the IAs. Thus, according to the Sellers, the APA did not provide the IAs the authority to make GAAP-based adjustments to the parties' working capital calculations under Section 2.8.

The question of what accounting methodology to use when performing a financial calculation pursuant to an arbitration clause has not been explicitly designated as procedural or substantive for purposes of the arbitrability analysis.  Several courts in this District have assumed without deciding that this sort of issue is indeed a question of substantive arbitrability. See, e.g., Severstal U.S. Holdings, LLC v. RG Steel, LLC, 865 F. Supp. 2d 430, 437-44 (S.D.N.Y. 2012); Talegen Holdings, Inc. v. Fremont Gen. Corp., No. 98 Civ. 366, 1998 WL 513066, at *3 (S.D.N.Y. Aug. 19, 1998); Advanstar Commc'ns Inc. v. Beckley-Cardy, Inc., No. 93 Civ. 4230, 1994 WL 176981, at *2-3 (S.D.N.Y. May 6, 1994); Campeau Corp. v. May Dep't Stores Co., 723 F. Supp. 224, 228 (S.D.N.Y. 1989).  It is unnecessary in this case to resolve whether the selection of an accounting method is a substantive or procedural question of arbitrability, because the issue is properly arbitrable in any event.

35

The Sellers argue that the application of GAAP was beyond the scope of what was submitted to the IAs, and that in applying GAAP-based adjustments, the IAs ruled on a question that was not arbitrable—namely, which accounting methodology to use in computing the purchase price adjustment.  The issue of an arbitration agreement's scope is governed by federal law.[10] Progressive, 991 F.2d at 48.  In assessing the scope of an arbitration agreement, a court should first classify a clause as either "broad" or "narrow."  Louis Dreyfus Negoce, 252 F.3d at

---

[10] Both parties appear to have assumed that their dispute about the propriety of the GAAP-based adjustments implicated state law.  The Sellers rely on two New York state court cases that arise under New York law, see Westmoreland Coal Co. v. Entech, Inc., 794 N.E.2d 667 (N.Y 2003); Terex Corp. v. Bucyrus Int'l, Inc., 943 N.Y.S.2d 18 (App. Div. 2012), and the Buyers rely primarily on a federal court's interpretation of state contract law.  See Severstal, 865 F. Supp. 2d at 440-41 (distinguishing Westmoreland).  Although "the existence of a binding agreement to arbitrate is a matter of state law, the issue of an arbitration agreement's scope is governed by the federal substantive law of arbitrability."  Protostorm, LLC v. Antonelli, Terry Stout, & Kraus, LLP, No. 08 Civ. 931, 2010 WL 785316, at *5 (E.D.N.Y. Mar. 8, 2010) (quoting Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 48 (2d Cir. 1993)) (internal quotation marks omitted).  The propriety of the GAAP adjustments raises only an issue of scope, not an issue of the existence of a valid and binding agreement in the first place; accordingly, federal law governs.  Moreover, as explained below, the state-law authorities cited by the Sellers are distinguishable from the facts of this case.  They therefore have no bearing on the arbitrability of the issue presented here.

224.  "Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." Id. at 224 (citations and internal quotation marks omitted).

Section 2.8 of the APA is a narrow arbitration clause. There is no language in Section 2.8 or elsewhere in the APA indicating the parties' intent "to submit to arbitration disputes of *any* nature or character." McDonnell Douglas, 858 F.2d at 832 (emphasis added) (citation and internal quotation marks omitted).  Rather, the parties agreed to arbitrate only "[t]he determination . . . *of the Actual Working Capital*." (English Decl., Ex. A, § 2.8 (emphasis added).)  Such limitations on the scope of an arbitrator's role indicate a narrow clause for purposes of the arbitrability analysis. See, e.g., Bank of Am., Nat'l Ass'n v. Commack Props., No. 09 Civ. 5296, 2010 WL 5139219, at *4 (E.D.N.Y. Dec. 10, 2010); Thule AB v. Advanced Accessory Holding Corp., No. 09 Civ. 91, 2009 WL 928307, at *1 (S.D.N.Y. Apr. 2, 2009) ("The purchase agreement sets forth dispute-resolution procedures in the event that the parties could not agree on the calculation of post-closing adjustments.  The arbitration clause is narrow.").

37

Because Section 2.8 is a narrow arbitration clause, the issue is whether the application of GAAP to the working capital determination is a "collateral issue," or falls reasonably within the scope of the clause.  Louis Dreyfus Negoce, 252 F.3d at 224.  When determining the scope of a narrow arbitration clause, courts must be mindful that Congress's strong preference for arbitration embodied in the FAA requires "any doubts concerning the scope of arbitrable issues [to] be resolved in favor of arbitration."  Moses H. Cone Mem'l Hosp., 460 U.S. at 24–25; see also Advanstar Commc'ns, 1994 WL 176981, at *3 ("A narrow arbitration clause must be construed in favor of arbitration, but courts may not disregard the boundaries set by the agreement.").

The dispute over the propriety of adjustments for non-compliance with GAAP falls well within the scope of the arbitration clause.  Section 2.8 imposes no explicit limits on the type of objections to the calculation of working capital that may be raised before the arbitrators.  To the contrary, the provision calls for "any dispute" relating to the determination of actual closing working capital to be submitted to the IAs for binding determination.  Reasonably interpreted, Section 2.8 therefore reflects the parties' intent to arbitrate all disputes relating to the parties' differences over the determination of

actual closing working capital.  See Talegen Holdings, 1998 WL
513066, at *4.

Moreover, the calculation of working capital for the
purpose of making a purchase price adjustment necessarily
entails resolving the proper accounting methodology to be used.
See Advanstar Commc'ns, 1994 WL 176981, at *3 ("[A]ny disputes
regarding the[] calculation[ of the purchase price adjustment]
are to be resolved by an independent auditor.  The accounting
methods are integral to the derivation of these calculations.").
Section 2.8 calls for adjustments to the purchase price based on
the extent to which actual closing working capital deviates from
the target working capital of $45 million.  "Target working
capital," in turn, is expressly required to be "determined in
accordance with GAAP."  The question of whether either party's
calculation under Section 2.8 failed to comply with GAAP was
therefore squarely within the scope of arbitrable issues under
Section 2.8.  See Talegen, 1998 WL 513066, at *4 ("Both of [the]
claims fall squarely within the ambit of the [purchase price
adjustment arbitration] clause, as they essentially involve
disputes over whether the Acquisition Audit was accurate and
whether any adjustments to the purchase price, consistent with
prevailing accounting practices, are warranted."); Campeau, 723
F. Supp. at 228 (holding that a purchase price adjustment

39

arbitration provision rendered disputes regarding accounting methodology arbitrable).

The Sellers argue that by making representations and warranties regarding their compliance with GAAP elsewhere in the APA, they expressly excluded objections relating to non-compliance with GAAP from the purview of the arbitration clause. This argument has been considered and rejected by other judges in this District, who have consistently concluded that it is of no moment that disputes about arbitrability could also be characterized as arising under other provisions of a contract. See, e.g., Talegen, 1998 WL 513066, at *6 (finding that claims are arbitrable, "even if the claims may be characterized another way"); Gestetner Holdings, PLC v. Nashua Corp., 784 F. Supp. 78, 81 (S.D.N.Y. 1992) (finding that a claim was arbitrable even though it could also have been characterized as a claim for breach of representations and warranties).

The only cases cited by the Sellers in support of their position arise under state law.  See Westmoreland, 794 N.E.2d 667 (involving a proceeding to compel arbitration pursuant to Section 7601 of the New York Civil Procedure Law and Rules); Terex, 943 N.Y.S.2d 18 (following Westmoreland in interpreting a post-closing purchase price adjustment provision).  But federal, not state law, governs.  See Progressive, 991 F.2d at 48.

40

Moreover, Westmoreland and Terex are easily distinguishable from this case because the representations and warranties sections of the contracts at issue in those cases, unlike the APA provisions in this case, included exclusive remedy clauses that indicated the parties' intent to limit the scope of the arbitrators' authority.  See Westmoreland, 794 N.E.2d at 671 ("The indemnification provisions . . . require that, if negotiations fail, [claims for non-compliance with GAAP] are to be resolved exclusively by litigation. . . . Thus, Westmoreland's interpretation of the purchase price adjustment provisions to provide a remedy for breach of a representation or warranty . . . would subvert this 'exclusive remedies' limitation . . . ."); Terex, 943 N.Y.S.2d at 21 ("[T]he parties' agreement is indistinguishable from that in Westmoreland in that both provide the exclusive remedy of indemnification for any financial misrepresentations by the seller, thereby precluding the use of the post-closing adjustment provision as a remedy."). Here, by contrast, there is no exclusive remedy provision in the representations and warranties section of the APA, and the representations in that section as to the Sellers' compliance with GAAP therefore cannot be construed as a manifestation of intent to deprive the IAs of jurisdiction over disputes about the proper accounting methodology to be used in calculating

41

actual closing working capital.  Indeed, it would have been
impossible for the IAs to calculate the proper purchase price
adjustment without settling on an accounting methodology to use
in doing so.  Accordingly, the question of what accounting
methodology to use was arbitrable, and the adjustments for non-
compliance with GAAP cannot be vacated under the arbitrability
standard.  The IAs' resolution of this issue is therefore
entitled to great deference.

B.

The Sellers have thus failed to establish that any of the
issues submitted to the IAs were not properly arbitrable, and
they therefore bear a heavy burden in seeking to vacate or
modify the award.  "A party moving to vacate an arbitration
award has the burden of proof, and the showing required to avoid
confirmation is very high."  D.H. Blair & Co., Inc. v.
Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006).  "Arbitration
awards are not reviewed for errors made in law or fact."
British Ins. Co. of Cayman v. Water Street Ins. Co., 93 F. Supp.
2d 506, 514 (S.D.N.Y. 2000).  Rather, an award may only be
vacated on extremely limited grounds.  In this case, the grounds
that the Sellers appear to rely upon include: 1) "where the
arbitrators exceeded their powers, or so imperfectly executed

42

them that a mutual, final, and definite award upon the subject matter submitted was not made," 9 U.S.C. § 10(a)(4); 2) "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy," id. § 10(a)(3); or 3) where an award is in "manifest disregard of the law" because the arbitrators are "fully aware of the existence of a clearly defined governing legal principle, but refuse to apply it, in effect, ignoring it."  Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 96 (2d Cir. 2008) (citation omitted), rev'd on other grounds, 559 U.S. 662 (2010); see also Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 451-52 (2d Cir. 2011) (confirming the continued validity of the "manifest disregard" standard).  The FAA also permits an arbitration award to be judicially modified "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted."  9 U.S.C. § 11(b).

### 1.

The Sellers argue that the IAs' determination should be vacated under § 10(a)(4), or modified under § 11(b), because the IAs "exceeded their powers" by considering untimely adjustments to working capital beyond the time limit imposed by the APA.

The Second Circuit Court of Appeals has "consistently accorded the narrowest of readings to the FAA's authorization to vacate awards pursuant to § 10(a)(4)." <u>Banco de Seguros del Estado v. Mut. Marine Office, Inc.</u>, 344 F.3d 255, 262 (2d Cir. 2003) (citation and internal quotation marks omitted). "When a party seeks to vacate an arbitration award under Section 10(a)(4), the inquiry looks only to whether the arbitrator had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, and does not consider whether the arbitrator decided the issue correctly." <u>Thule AB</u>, 2009 WL 928307, at *3 (citation and internal quotation marks omitted); <u>see also</u> <u>DiRussa v. Dean Witter Reynolds Inc.</u>, 121 F.3d 818, 824 (2d Cir. 1997). "Only if the arbitrator acts outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract—may a court overturn his determination" under § 10(a)(4). <u>Oxford Health</u>, 133 S. Ct. at 2068 (citation and internal quotation marks omitted).[11]

---

[11] Article V(1)(c) of the Convention permits a court to refuse to enforce an arbitration award that "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or . . . contains decisions on matters beyond the scope of the submission to arbitration." Convention, art. V(1)(c). This provision "tracks in more

The Sellers contend that Section 2.8 set a hard-and-fast deadline of thirty days post closing—that is, June 18, 2012—for the Buyers to raise objections to the Sellers' calculation of estimated working capital, and that claims submitted by the Buyers for the first time on December 7, 2012 were therefore untimely, and should not have been considered by the IAs.  The Sellers object to portions of the award granting adjustments for "Reserve for Uncollectible Amounts" (totaling $552,789) and "Inventory" (totaling $2 million), (see Jiffy's Verified Am. Pet., Ex. 1 at 4-5), some portion of which, they argue, was not requested until December 7, 2012.

Ultimately, the Sellers' arguments raise nothing more than an issue of contract interpretation—namely, whether Section 2.8 imposed a hard-and-fast deadline upon the Buyers for the submission of claims, and, if so, whether the parties waived or modified this requirement at any point after the APA was executed.  Section 2.8 states that

> [w]ithin thirty (30) days after the Closing, the Buyers
> shall determine the actual working capital of the [Sellers]
> as of the Closing . . . .  Sellers shall have an
> opportunity to review the Buyers' determination of the
> Actual Closing Working Capital and, within fifteen (15)
> days after Sellers' receipt of Buyers' determination,

detailed form § 10(a)(4), and should likewise be construed narrowly."  Phoenix Bulk Carriers, Ltd. v. Am. Metals Trading, LLP, No. 10 Civ. 2963, 2013 WL 5863608, at *7 (S.D.N.Y. Oct. 31, 2013) (citation and internal quotation marks omitted).

> Sellers shall either agree with the calculation or, after
> negotiation with the Buyers, agree to submit any dispute to
> the binding determination of a third party accounting
> firm . . . .

This provision calls for a period of negotiation of unspecified
length to follow the submission of both parties' determinations
of working capital.  The IAs were then to be engaged not merely
in order to compare the parties' respective calculations of
estimated and actual working capital and determine who was
right, but, rather, to resolve "any dispute" arising out of
those negotiations and to prepare a report that provided "a
resolution of such unresolved disputes" that would be
"conclusive and binding upon all parties."  It was reasonable
for the IAs to conclude that they were authorized to take into
consideration arguments, claims, and information raised after
the respective thirty- and forty-five-day deadlines that
affected the determination of the actual closing working
capital.  In any event, the proper inquiry under § 10(a)(4) is
not whether the IAs interpreted the contract correctly, but,
rather, whether they "issu[ed] an award that simply reflect[ed
their] own notions of economic justice rather than drawing its
essence from the contract."  See Oxford Health, 133 S. Ct. at
2068.  The IAs' determinations as to the scope of information
and positions they were permitted to consider were based on
their "assessment of the requirements of the APA."  (Jiffy's

46

Verified Am. Pet, Ex. 1 at 3.)   Thus, the Sellers' objection is
not a basis under § 10(a)(4) for disturbing the IAs'
determinations.

This conclusion is bolstered by the terms of the addendum
to the engagement letter executed by the parties and the IAs on
December 6, 2012.   The addendum states that the IAs were to

> require, and Seed Holdings and Jiffy agree[d] to provide,
> complete, sufficient and appropriate documents and other
> materials to substantiate all relevant facts asserted in
> each of the respective parties' submissions.   The extent of
> the materials that [the IAs] will require will be subject
> to [their] discretion, and will include *but not be limited
> to*:
>
> 1. Documentation related to *post-acquisition* aging,
>    collection activity and payments received related to
>    accounts receivable outstanding as of the Acquisition
>    Date.
>
> 2. Documentation related to *post-acquisition* activity or
>    events in connection with Home Depot servicing cost
>    settlements.
>
> 3. Documentation related to *post-acquisition* McKenzie
>    inventory dispositions and recoveries.

(Jiffy's Verified Am. Pet., Ex. 7 at 1 (emphasis added).)   The
addendum also states that it "is not intended to be, and is not
to be construed as, an amendment to [the APA] or any other
agreement between Buyers and Sellers."   (Jiffy's Verified Am.
Pet., Ex. 7 at 1 .)

It is reasonable to read the addendum as clarifying the
parties' intent to grant the IAs discretion to consider

materials they deemed relevant—including materials or arguments predicated on post-closing developments that affected the actual closing working capital, determined as of the closing date of the transaction.  The IAs concluded as a matter of contractual interpretation, and on the basis of "the manner in which the parties chose to proceed," that "the books on the disputed matters ha[d] essentially been kept open by both parties in at least some respects . . . ."  (Jiffy's Verified Am. Pet., Ex. 1 at 3.)

The only authority cited by the Sellers in support of their position is an unpublished opinion from the Delaware Court of Chancery.  See Aveta, Inc. v. Bengoa, No. 3598, 2010 WL 761203 (Del. Ch. Mar. 1, 2010).  They argue that this case stands for the proposition that an arbitration clause with a deadline on submissions bars arbitrators from reaching disputes that are raised outside of the deadline.  However, the Aveta court clarified that it was not reaching the merits of a matter that had been properly "consigned to arbitration," but, rather, that it was making a "determination as to the scope of the arbitration," id. at *1—that is, a determination about arbitrability under Delaware law.  However, under the federal arbitrability standard, the dispute about the timeliness of the parties' claims was arbitrable.  Furthermore, the Aveta court

was construing the contract before it, which expressly committed "disputes [not resolved] . . . within [a] 20-day period" to arbitration.  Id.  Section 2.8 commits "any dispute" arising out of a period of negotiations of unspecified length to the IAs, and the parties subsequently agreed to provide information relating to post-acquisition events to the IAs.  Accordingly, Aveta is neither authoritative nor persuasive in the context of this case.

It was reasonable for the IAs to construe Section 2.8 as permitting consideration of information and arguments arising after the thirty-day deadline—especially in the context of "the manner in which the parties chose to proceed."  (Jiffy's Verified Am. Pet., Ex. 1 at 3.)  The roughly $2.5 million in allegedly late-raised claims that were ultimately granted by the IAs therefore cannot be vacated under § 10(a)(4).

The Sellers also invoke § 11(b) as a basis for disturbing the IAs' award for having credited allegedly late-raised claims. Section 11(b) authorizes a court to "make an order modifying or correcting" an arbitration award "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted."  9 U.S.C. § 11(b).  Modification under § 11(b) is available in circumstances that are "similarly limited" to those

49

in which vacatur is warranted under § 10(a)(4).  Katz v.
Feinberg, 167 F. Supp. 2d 556, 563 (S.D.N.Y. 2001); see also
PremiereTrade Forex LLC v. FXDirectDealer, LLC, No. 12 Civ.
7006, 2013 WL 2111286, at *5 (S.D.N.Y. May 16, 2013); Vertical
UK LLP v. Dundee Ltd., No. 10 Civ. 1173, 2011 WL 2419859, at *3
(S.D.N.Y. June 13, 2011).  The Sellers' § 11(b) claim fails for
the same reasons that their § 10(a)(4) claim fails.


                                 2.

     The Sellers' second argument is that the IAs exceeded their
authority by making GAAP-based adjustments to the parties'
calculations of working capital under Section 2.8.  According to
the Sellers, these improper adjustments amount to roughly $2.5
million—$552,789 for "Accounts Receivable—Reserve for
Uncollectible Amounts" and $2 million for "Inventory."  (See
Jiffy's Verified Am. Pet, Ex. 1 at 4, 5.)  The Sellers argue
that the GAAP-based adjustments should be vacated under
§ 10(a)(4) because they were made in excess of the IAs' powers,
and also because these adjustments were made "in manifest
disregard of the law."  9 U.S.C. § 10(a)(4); Yusuf Ahmed
Alghanim & Sons, 126 F.3d at 23; see also Schwartz, 665 F.3d at
451-52.  The Sellers also proffer § 11(b) as a basis for

                                 50

modification of those portions of the IAs' award that were based on adjustments for non-compliance with GAAP.

The question of whether to make GAAP-based adjustments to the calculation of working capital under Section 2.8 was properly before the IAs.  The IAs determined that both parties had improperly calculated working capital by failing to comply with GAAP.  The IAs reached the conclusion that GAAP was the proper accounting methodology to use as a matter of contractual interpretation, reasoning from the definitions of actual, estimated, and target working capital in Section 1.1 and the text of Section 2.8.  (See Jiffy's Verified Am. Pet, Ex. 1 at 1-2.)  It therefore cannot be said that the award failed to draw its essence from the contract.  Rather, it appears that the Sellers' argument is simply that the IAs misinterpreted Section 2.8.  But error—even "obvious" error—in interpreting a contract regarding an issue that has been properly submitted to arbitration is not a basis under § 10(a)(4) for vacating an award.  DiRussa, 121 F.3d at 824; see also Thule, 2009 WL 928307, at *2-3 (rejecting a § 10(a)(4) objection because it was "premised on a contention that by identifying portions of the purchase agreement as ambiguous and then attempting to resolve the ambiguity, the Reviewing Accountant exceeded his authority").  Indeed, it is difficult to see any error in the

IAs' decision to make GAAP adjustments.  Section 2.8 clearly
called for a comparison between working capital and the GAAP-
based benchmark of target working capital.  The most reasonable
assumption therefore appears to have been that all calculations
of working capital under Section 2.8 needed to comply with GAAP.
The Sellers' contention that the plain language of Section 2.8
required working capital to be computed "consistent[ly] with the
Sellers' past custom and practices"—and without regard to GAAP—
finds no support in the text of the APA.  Moreover, the IAs did
not ignore past practices.  The IAs explained that in making
calculations of working capital, each party was required to
apply the Sellers' previously established accounting practices
and methods where those previous practices complied with GAAP.
(See Jiffy's Verified Am. Pet., Ex. 1 at 2-3.)  But the IAs
could not ignore GAAP when the estimates of working capital were
being compared to the target working capital that was explicitly
to be calculated according to GAAP.  Accordingly, the Sellers'
motion to vacate the adjustments made for non-compliance with
GAAP under § 10(a)(4) must be denied.[12]

_____

[12] The Sellers rely on Melun Indus. v. Strange, 898 F. Supp. 990
(S.D.N.Y. 1990)—a case in which an arbitration award was vacated
under § 10(d), the predecessor to § 10(a)(4).  In that case, an
arbitration clause called expressly for the arbitrator to
determine "the amount, if any, by which the book value . . .
increased or decreased during the period from September 1, 1986

The "manifest disregard of the law" standard also provides
no basis to vacate the IAs' determination.  That standard is
"severely limited, highly deferential, and confined to those
exceedingly rare instances of egregious impropriety on the part
of the arbitrators."  Stolt-Nielsen, 548 F.3d at 95 (citation
and internal quotation marks omitted), rev'd on other grounds,
559 U.S. 662 (2010).  To satisfy the "manifest disregard of the
law" standard, a party objecting to an arbitration decision must
establish that the law that was allegedly ignored was clear,
that the law was in fact improperly applied, leading to an
erroneous outcome, and that the arbitrator knew of the law and

---

to the Closing Date."  Id. at 994.  Instead of performing this
calculation, the arbitrator "clearly viewed his task as to
determine the true value of [the] assets as of November 30, and
to correct any perceived errors in the accounting methods used
in valuing the assets."  Id.  The court concluded that "[t]his
was an incorrect interpretation of [the arbitrator's] authority
under the Agreement[, which] d[id] not empower the arbitrator to
resolve any and all disputes between the parties, or to
determine the 'fair' sale price for the company."  Id.  As one
court has recognized, the holding in "Melun stands for the
principle that arbitration is a creature of contract, and that
an arbitrator may not exceed his contractual authority by
deciding issues not within the scope of the arbitration
agreement."  Thule, 2009 WL 928307, at *3.  Where, by contrast,
an arbitrator "d[oes] nothing more than resolve [a] dispute over
post-closing adjustments, which f[alls] within the scope of the
arbitration agreement and ha[s] been submitted to him for
decision," the award must be confirmed as long as it draws its
essence from the contract.  Id.; see also Oxford Health, 133 S.
Ct. at 2068.

intentionally disregarded it.  T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010).  "With respect to contract interpretation, this standard essentially bars review of whether an arbitrator misconstrued a contract."  Id.; see also Phoenix Bulk Carriers, 2013 WL 5863608, at *5.

The Sellers' conclusory invocation of the "manifest disregard" standard falls far short of establishing a basis for vacating the IAs' award.  The Sellers point to no particular provision of law that the IAs ignored, except for the holdings in Westmoreland and Terex, which, according to the Sellers, together stand for a categorical principle of New York law that questions of GAAP compliance are outside the scope of an arbitrator's authority under a purchase price adjustment provision.  However, the Westmoreland and Terex courts were construing the specific contracts before them, see McGraw-Hill Cos. v. Sch. Specialty, Inc., 840 N.Y.S.2d 47, 48 (App. Div. 2007), and those contracts differ from the APA at issue in this case.  Accordingly, the Sellers' invocation of the "manifest disregard" standard amounts to nothing more than an argument that the IAs misconstrued the APA, which is not a basis for vacating an arbitration award on an issue that was properly before the arbitrators.  See Phoenix Bulk Carriers, 2013 WL 5863608, at *5.

Finally, the Sellers invoke § 11(b) as a basis for disturbing the IAs' award because of the GAAP-based adjustments, but an asserted error in contract interpretation is not a basis for modification under § 11(b).

For these reasons, there is no ground for disturbing those portions of the IAs' award that were based on either party's non-compliance with GAAP.

C.

The Sellers also raised a third and final objection—namely, that the IAs' adjustments were improper because the IAs failed to consider certain documents that they were required to consider in arriving at the award.  The Sellers argue that the IAs failed to consider a) certain documentation related to post-acquisition activity, b) events in connection with "Home Depot servicing cost settlements," and c) certain documentation related to post-acquisition "McKenzie inventory dispositions and recoveries"—all of which they claim the IAs were required to consider under the addendum to the engagement letter.  The Sellers also argue that the IAs failed to perform agreed-upon testing of a sample selection of accounts receivable to confirm whether they were indeed outstanding and uncollectible for the purposes of calculating working capital under Section 2.8.

This objection relies on § 10(a)(3) of the FAA, which permits vacatur "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). "Courts have interpreted section 10(a)(3) to mean that except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review." Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997). Arbitrators "must give each of the parties to the dispute an adequate opportunity to present its evidence and argument," but they are "not required to hear all the evidence proffered by a party." Id. (citation and internal quotation marks omitted); see also Areca, Inc. v. Oppenheimer & Co., Inc., 960 F. Supp. 52, 55 (S.D.N.Y. 1997) ("Although arbitrators must have before them enough evidence to make an informed decision, they need not compromise the speed and efficiency that are the goals of arbitration by allowing the parties to present *every piece* of relevant evidence." (citation omitted)).

The Sellers' objection falls short of the showing necessary to establish a basis for vacatur under § 10(a)(3). There is no showing that the IAs failed to consider the evidence submitted by the Sellers and the IAs were under no obligation to obtain other evidence. The Sellers assert only that there is no

indication in the final report that the documents and testing in question were taken into consideration.  But the IAs were under no obligation to provide more detail for their report than they actually provided.  See D.H. Blair, 462 F.3d at 110.  Here, the IAs attested that they had "consider[ed] the respective parties' submissions, presentations, responses and those materials each party has submitted in support of their respective positions and in demonstration of the underlying facts relevant to their positions."  (Jiffy's Verified Am. Pet, Ex. 1 at 3.)  The fact that documentation supporting the Sellers' position was not ultimately credited does not mean it was not considered.

Moreover, vacatur under § 10(a)(3) would be especially inappropriate in light of the procedures followed by the IAs, which included the opportunity for written submissions, telephone conferences, and the chance to submit objections to a draft report.  The parties submitted substantial briefing to the IAs regarding their respective constructions of the contract, the pertinent financial statements, and the IAs' obligations under the law.  The IAs attested that they took them into account, and there is no basis for discrediting this attestation.  Accordingly, there was no violation of fundamental fairness, and there is no basis for vacatur under § 10(a)(3).

D.

The Sellers' objections are therefore without merit.
Because the Sellers have established no basis for disturbing the
IAs' award, the Sellers' motion to vacate or modify the IAs'
award must be denied.  For the same reason, Seed's motion in the
Seed Action to confirm the IAs' award must be granted.  9 U.S.C.
§ 207; see, e.g., Century Indem. Co. v. AXA Belgium, No. 11 Civ.
7263, 2012 WL 4354816, at *12 (S.D.N.Y. Sept. 24, 2012); Thule,
2009 WL 928307, at *3.

E.

The Buyers request that the Court award interest on the
IAs' award at a rate of nine percent per annum from the date of
the award—namely, April 3, 2013—to the date that judgment is
entered in this matter.  "The decision whether to grant
prejudgment interest in arbitration confirmations is left to the
discretion of the district court."  Herrenknecht Corp. v. Best
Road Boring, No. 06 Civ. 5106, 2007 WL 1149122, at *3 (S.D.N.Y.
Apr. 16, 2007) (citation omitted).  In the Second Circuit, there
is "a presumption in favor of prejudgment interest."  Waterside
Ocean Navigation Co. v. Int'l Navigation Ltd., 737 F.2d 150, 154
(2d Cir. 1984); see also Herrenknecht, 2007 WL 1149122, at *3.
There is some disagreement as to whether state or federal law

governs the rate at which pre-judgment interest is to be
awarded, but courts in the Second Circuit generally apply the
state statutory rate—in New York, nine percent, see N.Y.
C.P.L.R. § 5004—"even where, as here, federal law governs
enforcement of the arbitration award." Westchester Fire Ins.
Co. v. Massamont Ins. Agency, Inc., 420 F. Supp. 2d 223, 227
(S.D.N.Y. 2005). Moreover, awarding interest at a rate of nine
percent per annum has been described as "common practice among
the courts of this Circuit," N.Y. City Dist. Council of
Carpenters Pension Fund v. E. Millenium Constr., Inc., No. 03
Civ. 5122, 2003 WL 22773355, at *3 (S.D.N.Y. Nov. 21, 2003), and
is especially appropriate in this case given that the APA
contains a New York choice-of-law clause. See Westchester Fire,
420 F. Supp. 2d at 227. Thus, the Buyers are entitled to
interest at a rate of nine percent per annum computed from April
3, 2013 to the date on which judgment is entered in the Seed
Action.


CONCLUSION

The Court has considered all of the arguments of the
parties. To the extent not specifically addressed above, all
other arguments raised by the parties are either moot or without
merit.

For the reasons explained above, the Sellers' motion to remand the Jiffy Action to state court is **denied,** and the Sellers' motion to stay or dismiss the Seed Action is **denied as moot.** Both parties' motions for costs and attorneys' fees in connection with the remand motion are **denied.**

The Sellers' motion in the Jiffy Action to vacate or modify the IAs' award is **denied.** The Clerk is directed to **enter judgment dismissing the Jiffy Action,** Case No. 13 Civ. 2755.

Seed's motion in the Seed Action to confirm the IAs' award is **granted.** The Clerk is directed to **enter judgment in the amount of $4,240,059 in favor of Seed in the Seed Action,** Case No. 13 Civ. 2284. The Clerk is further directed to **calculate pre-judgment interest** on that amount at a rate of **nine percent per annum running from April 3, 2013 to the date on which judgment is entered in the Seed Action.**

The Clerk is directed to **close all pending motions in these actions** and to **close these cases.**

**SO ORDERED.**

**Dated:      New York, New York**
**            March 21, 2014**                    _____/s/_____
                                                 **John G. Koeltl**
                                        **United States District Judge**

60